Citation Nr: 1443688 
Decision Date: 09/30/14 Archive Date: 10/06/14

DOCKET NO. 10-27 554 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to an evaluation higher than 10 percent for chondromalacia and degenerative joint disease of the left knee.

2. Entitlement to an evaluation higher than 20 percent for traumatic arthritis of the cervical spine.

3. Entitlement to an initial evaluation higher than 10 percent for right C5-6 radiculopathy (major) (also claimed as arm/hand weakness, right side pain, and shoulder blade pain).

4. Entitlement to an evaluation higher than 10 percent for left eye disability.

5. Entitlement to service connection for a psychiatric disorder to include major depression and posttraumatic stress disorder (PTSD) secondary to personal trauma, manifested by anxiety and depression with emotional stress and sleep disorder.

6. Entitlement to service connection for headaches with dizziness.

7. Entitlement to service connection for trouble swallowing.

8. Entitlement to service connection for fever and night sweats.

9. Entitlement to service connection for right leg muscle spasms with radiating pain and loss of feeling, right foot.

10. Entitlement to service connection for hypertension.


REPRESENTATION

Appellant represented by: Florida Department of Veterans Affairs


WITNESSES AT HEARING ON APPEAL

Appellant and her spouse


ATTORNEY FOR THE BOARD

Sarah Richmond, Counsel


INTRODUCTION

The Veteran had active military service from August 1979 to February 2003.

This matter comes to the Board of Veterans' Appeals (Board) from rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Petersburg, Florida. In July 2007 the RO denied an increased rating higher than 10 percent for left knee chondromalacia. The Veteran submitted a statement in June 2008, within one year of the July 2007 rating decision indicating that she wanted to "reopen" her increased rating claim for the left knee disability. The Board construes the Veteran's statement as her desire to continue her claim for the increased rating for the left knee, and will thus treat the July 2007 rating decision as the decision on appeal with respect to the knee. In October 2008 the RO continued to deny an increased rating higher than 10 percent for left knee chondromalacia/ degenerative joint disease. 

The RO granted an increased rating of 20 percent, effective November 25, 2008, for the cervical spine disability in a January 2009 rating decision; and granted service connection for right C5-6 radiculopathy assigning a 10 percent rating, effective November 25, 2008. 

In September 2010, the RO, in pertinent part, denied service connection for anxiety and depression with emotional stress and sleep disorder, headaches with dizziness, trouble swallowing, fever and night sweats, right leg muscle spasm, and hypertension. In statements submitted in January 2011, the Veteran amended her psychiatric claim to include PTSD due to personal trauma. Thus, the Board has reframed the issue as represented on the first page of this decision.

The RO also granted service connection for left eye ptyergium and glaucoma of both eyes in the September 2010 rating decision and combined this rating with the 10 percent rating already assigned for left eye cataract. Within a year of this rating decision, the Veteran submitted an August 2011 statement disagreeing with the 10 percent rating assigned for the left eye. A statement of the case is not of record.

In November 2011, the Veteran and her spouse testified before the undersigned Veterans Law Judge at a Board hearing at the RO.

During the course of the appeal the RO granted temporary total ratings based on surgery requiring convalescence for the left knee disability, effective May 29, 2007 to August 1, 2007, and effective November 22, 2011 to February 1, 2012. As the Veteran is receiving the maximum rating of 100 percent for the left knee disability for these time frames, they will not be considered in the decision below.

The Board remanded this case for additional development in November 2013. The case is now returned for appellate review.

The issues of service connection for hypertension and headaches, secondary to service-connected psychiatric disorder, and increased rating for a left eye disability are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).

The issue of entitlement to service connection for a right knee disability secondary to the service-connected left knee disability has been raised by the record via testimony submitted by the Veteran at the November 2011 Board hearing (see Transcript, p. 19), but has not been adjudicated by the Agency of Original Jurisdiction (AOJ). Therefore, the Board does not have jurisdiction over it, and it is referred to the AOJ for appropriate action. 38 C.F.R. § 19.9(b) (2014).


FINDINGS OF FACT

1. It is at least as likely as not that the Veteran's psychiatric disorders, including depressive disorder and PTSD are attributable to military service, including sexual assault.

2. The medical evidence shows that the Veteran does not have any disabilities manifested by trouble swallowing, fever, night sweats, or right leg muscle spasms with loss of feeling in right foot.

3. The Veteran's left knee disability is manifested by history of meniscal tear, degenerative joint disease, range of motion most severely limited to 90 degrees of flexion and 5 degrees of extension, and no more than slight instability in the left knee. 

4. The Veteran's cervical spine disability is manifested by forward flexion most severely limited to 20 degrees, with painful motion, and radiating pain into the bilateral upper extremities.

5. The right C5-6 radiculopathy is manifested by impairment no greater than the equivalent of mild incomplete paralysis of the right upper extremity. 


CONCLUSIONS OF LAW

1. Service connection for an acquired psychiatric disorder, characterized as depression and PTSD, is warranted. 38 U.S.C.A. §§ 1110, 1131, 5107(b) (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.304(f) (2014).

2. Service connection for trouble swallowing is not warranted. 38 U.S.C.A. §§ 1110, 1131, 5107(b) (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.304(f) (2014).

3. Service connection for fever and night sweats is not warranted. 38 U.S.C.A. §§ 1110, 1131, 5107(b) (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.304(f) (2014).

4. Service connection for right leg muscle spasms with radiating pain and loss of feeling in the right foot is not warranted. 38 U.S.C.A. §§ 1110, 1131, 5107(b) (West 2002); 38 C.F.R. §§ 3.102, 3.303, 3.304(f) (2014). 

5. The criteria for an evaluation higher than 10 percent for limitation of motion due to degenerative arthritis of the left knee have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 & Supp. 2013); 38 C.F.R. §§ 3.159, 4.1, 4.3, 4.7, 4.71a, Diagnostic Codes (DCs) 5010-5260 (2014).

6. The criteria for a separate evaluation of 10 percent, but no higher, for instability of the left knee have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 & Supp. 2013); 38 C.F.R. §§ 3.159, 4.1, 4.3, 4.7, 4.71a, Diagnostic Codes (DC) 5257 (2014).

7. The criteria for an evaluation higher than 20 percent for the cervical spine disability have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 & Supp. 2013); 38 C.F.R. §§ 3.159, 4.1, 4.3, 4.7, 4.71a, Diagnostic Codes (DC) 5242 (2014).

8. The criteria for entitlement to an initial rating in excess of 10 percent for right C5-6 radiculopathy (major) have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2002); 38 C.F.R. §§ 4.1, 4.3, 4.7, 4.120, 4.123, 4.124, 4.124a, DC 8515 (2014). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Duties to Notify and Assist

Upon receipt of a complete or substantially complete application for benefits and prior to an initial unfavorable decision on a claim by an agency of original jurisdiction, VA is required to notify the appellant of the information and evidence not of record that is necessary to substantiate the claim(s). See 38 U.S.C.A. § 5103(a) (West 2002 & Supp. 2013); 38 C.F.R. § 3.159 (2013); Pelegrini v. Principi, 18 Vet. App. 112 (2004); Quartuccio v. Principi, 16 Vet. App. 183 (2002); Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006). The notice should also address the rating criteria or effective date provisions that are pertinent to the Veteran's claim. Dingess v. Nicholson, 19 Vet. App. 473 (2006). 

The RO provided the Veteran pre-adjudication notice by letters dated in May 2007, December 2008, February 2009, May 2009, August 2009, and August 2010. Neither the Veteran, nor her representative, has alleged error in VA's notice to the Veteran in this appeal. Hence, the duty to notify has been satisfactorily met. 

VA has obtained service treatment and personnel records, assisted the Veteran in obtaining evidence (post-service VA and private outpatient treatment records), and provided VA examinations to address the disabilities on appeal. The examination reports addressed all the pertinent issues. After the last examination in December 2013, the Veteran submitted a statement a few days later that her cervical spine disability was worse; however, the Board finds that the December 2013 VA examination, which took place a few days prior to the Veteran's statement, is contemporaneous enough with the Veteran's complaints that it adequately addressed the present severity of her cervical spine disability. The Veteran did not address any precipitating factors, such as injury, or anything unusual to indicate that her cervical spine disability had worsened in the few days since her last examination. Therefore the Board does not find that additional examination is warranted to address the cervical spine disability.

The Veteran mentioned at the Board hearing that her VA doctor who performed the knee surgery in 2007 said it was possibly causing weakness in the right knee. See November 2011 Board hearing transcript, p. 19. There is no record of this, as this was apparently and oral statement. Regardless, the statement would be speculative and of limited probative value. In addition, the disability on appeal involves right leg muscle spasm. Thus, any right knee disability would not really be relevant to the claim on appeal. Therefore, the Board has no duty to conduct additional development in this regard.

VA also afforded the Veteran the opportunity to give testimony before the Board. The Board hearing focused on the elements necessary to substantiate the claims, and the Veteran, through her testimony, demonstrated that she had actual knowledge of the elements necessary to substantiate her claim. As such, the Board finds that, consistent with Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Veterans Law Judge complied with the duties set forth in 38 C.F.R. § 3.103(c)(2). 

VA has complied with the notice and assistance requirements and the appellant is not prejudiced by a decision on the claims at this time.

II. Service Connection

Service connection may be granted for disability due to disease or injury incurred in or aggravated by active military service. 38 U.S.C.A. § 1110; 38 C.F.R. §§ 3.303, 3.304. 

When there is an approximate balance of positive and negative evidence regarding the merits of an issue material to the determination of the matter, the benefit of the doubt in resolving each such issue shall be given to the claimant. 38 U.S.C.A. § 5107(b). When all of the evidence is assembled, VA is responsible for determining whether the evidence supports the claim or is in relative equipoise, with the Veteran prevailing in either event, or whether a fair preponderance of the evidence is against the claim, in which case the claim is denied. Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990).

A) Psychiatric Disorder to Include Depression and PTSD

The Veteran contends that she has anxiety, depression, and a sleep disorder secondary to the pain associated with her cervical spine disability. In 2010 and 2011, she also presented an alternate theory of entitlement for a psychiatric disorder, namely PTSD, associated with personal trauma, including physical and sexual assault and a motor vehicle accident during her military service. She noted that during boot camp in 1979, she witnessed a female service member in the locker room who had hung herself and later died. She noted that in 1981 she was stationed at her first duty station in Orlando, Florida and was sent to Okinawa, Japan as the only female in a department of over 60 males and was harassed by the male service members. She recalled that they would put used condoms under her bed sheets while she slept, among other things. She noted that in 1989 she was stationed at the Naval Weapons Station Seal Beach and was sexually harassed and assaulted by her supervisor. She noted that she had bad headaches every day. She further noted one incident when she was getting dressed in the bathroom when her supervisor physically and verbally attacked her and injured her face and she had to go to the hospital. She indicated that her supervisor told her to tell people she had tried to break up a fight. Service treatment records note an emergency room record in September 1990 when the Veteran was treated for a laceration to the face. The record notes that the Veteran indicated that she had been trying to break up a fight. She also indicated that she still has anxiety from the car accident she had in service and that whenever she drives and another car approaches her fast from behind, she is reminded of her previous car accident. 

She submitted numerous lay statements from family, including her husband and son, as well as friends recalling the Veteran's depression and suffering due to her car accident in service, and physical pain she suffered, as well as her reports of physical and sexual harassment in service. 

The Veteran underwent a VA examination to address the etiology of her psychiatric disorder in August 2010. She was diagnosed as having major depressive disorder, single episode, moderate. She did not report the personal trauma she later mentions on statements in 2010 and 2011, but noted that she had had a stroke the previous year. The examiner determined that the Veteran's depression was not related to her service-connected traumatic arthritis of the cervical spine. The rationale was that the Veteran had suffered from a cerebrovascular accident in the past year and that it was common for patients with this condition to have a major depressive episode. As the examiner did not consider the Veteran's alternate theory of entitlement based on personal trauma in service, however, an additional examination was provided.

A July 2012 VA treatment record signed by a psychologist notes the Veteran's reported stressor of being sexually harassed and assaulted by her chief and also seeing the body of a fellow service member who had hanged herself. The psychologist diagnosed the Veteran with depressive disorder. A November 2013 VA treatment record also signed by a psychologist notes a diagnosis of PTSD and depression secondary to military sexual trauma.

The Veteran also underwent a VA examination in December 2013 in which the examiner determined that the Veteran did not meet the criteria for PTSD and that her depressive disorder was not related to service because it was not diagnosed in service or soon thereafter. Instead the examiner seemed to relate her depression to her cerebrovascular accident in 2009.

The Veteran has consistently reported the stressor events in service. She is competent to relate these events and there is no reason shown to doubt her credibility in this regard. See, e.g., Washington v. Nicholson, 19 Vet. App. 362 (2005) (holding that a Veteran is competent to report what occurred during service because he or she is competent to testify as to factual matters of which he or she has first-hand knowledge). Her service treatment records are also consistent with her reports to the extent that they document her injury to her face at the time when she says she was injured by her chief who tried to rape her. As such, the Board finds that her statements concerning the unfortunate incidents in service are not only competent, but also credible and thus probative and add weight in her favor to her claim. See Struck v. Brown, 9 Vet. App. 145, 155-156 (1996).

In addition there are at least two VA psychologists who have related the Veteran's psychiatric disorder including depressive disorder to her reported traumas of being sexually assaulted. The United States Court of Appeals for the Federal Circuit (Federal Circuit Court) recently observed that 38 C.F.R. § 3.304(f)(5) specifically states that a medical opinion may be used to corroborate a personal-assault stressor, noting "medical opinion evidence may be submitted for use in determining whether the occurrence of a stressor is corroborated." See Menegassi v. Shinseki, 683 F.3d 1379, 1382 (Fed. Cir. 2011) (observing that the United States Court of Appeals for Veterans Claims (Court/CAVC) erred when it determined that a medical opinion based on a post-service examination of a Veteran cannot be used to establish the occurrence of a stressor); see also Patton v. West, 12 Vet. App. 272, 280 (1999) (rejecting the requirement that "something more than medical nexus evidence is required for 'credible supporting evidence' " in personal-assault cases).

While the examiner in December 2013 found that the Veteran did not have PTSD or depression related to military service, there is nor reason shown to value this opinion over the other opinions of record. Also, while the December 2013 examiner noted that there was no psychiatric diagnosis soon after discharge from service, the VA treatment records actually show that in April 2004 (just outside the one-year period from the Veteran's discharge from service in February 2003) that the Veteran reported that she had often felt down, depressed, or hopeless during the past month, and also was often bothered by little interest or pleasure in doing things. This seems to suggest, contrary to the VA examiner's assessment, that the Veteran was suffering from some sort of mood disorder relatively soon after her discharge from service, or at least prior to 2009, when she suffered the cerebrovascular accident.

Because there is a medical diagnosis of depression and PTSD related to the claimed in-service stressor and credible supporting evidence of the occurrence of that stressor, the Board concludes that the evidence supports the granting of service connection for an acquired psychiatric disorder, to especially include PTSD and depressive disorder. 38 U.S.C.A. § 5107(b) ; 38 C.F.R. § 3.102; see also Gilbert v. Derwinski, 1 Vet. App. 49 (1990) (holding that "a Veteran need only demonstrate that there is an 'approximate balance of positive and negative evidence' in order to prevail.").; see Alemany v. Brown, 9 Vet. App. 518, 519 (1996) (An "absolutely accurate" determination of etiology is not a condition precedent to granting service connection, nor is "definite" or "obvious" etiology). Rather, the posited correlation between the claimed disability and service need only be an as likely as not proposition, which in this particular case it is. Therefore, resolving all doubt in the favor of the Veteran, the evidence shows that it is at least as likely as not that the Veteran's psychiatric disorder including PTSD and depressive disorder is related to her military service. 

B) Trouble Swallowing, Fever and Night Sweats, and Right Leg Muscle Spasm

The Veteran testified that trouble swallowing, fever, and night sweats started approximately four years ago associated with the stress related to her cervical spine disability. She also testified that her right leg spasms started three to four years ago and that the orthopedic doctor who performed her left knee surgery indicated that her left knee disability was possibly causing weakness in her right knee. Record of this opinion is not in the claims file. As noted in the VCAA section, it appears this was an oral statement only; the probative value would not be high as it is speculative; and also it is not directly relevant to the claim on appeal, which involves right leg spasm, rather than a right knee disability. Nonetheless, the Board has referred this matter to the RO.

In December 2013 the Veteran underwent VA examinations addressing her complaints. After a thorough examination of the throat and mouth the examiner determined that there was no objective evidence of a pathologic swallow condition. Regarding the Veteran's complaints of fever and night sweats, the examiner found that there was no objective evidence of any pathology that could explain these symptoms, other than the normal menopausal process, which the examiner found to be normal and not aggravated by the cervical spine disability. Finally the examiner found no objective evidence of any disability to explain the Veteran's symptoms in the right leg. The examiner noted that muscle spasms can be experienced with over-exertion and that this did not constitute a chronic pathological disability in the leg.

Pain alone, without a diagnosed or identifiable underlying condition does not constitute a disability for which service connection may be granted. Sanchez-Benitez v. West, 13 Vet. App. 282, 285 (1999), appeal dismissed in part, and vacated and remanded in part sub nom. Sanchez-Benitez v. Principi, 259 F.3d 1356 (Fed. Cir. 2001). Service connection cannot be granted if there is no present disability. 38 U.S.C.A. § 1110; 38 C.F.R. §§ 3.303, 3.304, 3.306. In the absence of proof of a present disability, there can be no valid claim. See Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992). As there is no diagnosed disability to account for the Veteran's complaints of trouble swallowing, fever and night sweats, and right leg spasms (and by extension her complaints of loss of feeling in the right foot), service connection cannot be granted.

The Veteran genuinely believes that she has disabilities manifested by trouble swallowing, fever and night sweats, and right leg spasms related to her cervical spine disability. She is competent to relate that which she can experience and her factual recitation as to her symptoms are accepted as true. However, as a layperson, lacking in medical training and expertise, the Veteran cannot provide a competent opinion on a matter as complex as the etiology of these symptoms and/or whether the symptoms can be attributed to a disability and her views are of no probative value. And, even if her opinion was entitled to be accorded some probative value, it is far outweighed by the detailed opinion provided by the medical professional who examined the Veteran and determined that there was no objective of any disabilities to explain the Veteran's symptoms. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007); Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006). 

For the foregoing reasons the preponderance of the evidence is against the Veteran's service connection claims for trouble swallowing, fever, night sweats, and right leg spasms with loss of feeling in the right foot, and the claims are denied.

II. Increased Rating 

Disability ratings are based on the average impairment of earning capacity resulting from disability. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. Separate diagnostic codes identify the various disabilities. Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability more closely approximates the criteria required for that rating. 38 C.F.R. § 4.7. Otherwise, the lower rating will be assigned. Id. 

The Court has held that in determining the present level of a disability for any increased evaluation claim, the Board must consider the application of staged ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007). In other words, where the evidence contains factual findings that demonstrate distinct time periods in which the service-connected disability exhibited diverse symptoms meeting the criteria for different ratings during the course of the appeal, the assignment of staged ratings would be necessary. 

The Veteran bears the burden of presenting and supporting his claim for benefits. 38 U.S.C.A. § 5107(a). In its evaluation, the Board considers all information and lay and medical evidence of record. 38 U.S.C.A. § 5107(b). When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Board gives the benefit of the doubt to the claimant. Id.

A) Left Knee

The RO originally granted service connection for chondromalacia of the left knee in a January 2003 rating decision assigning a 10 percent rating. The Veteran filed a claim for an increased rating for her left knee in April 2007. She indicated that her left knee disability was becoming progressively worse. In a July 2009 statement she also indicated that she had constant pain in the left knee and had to have fluid drained due to swelling in the knee. She testified at the November 2011 Board hearing that she had instability in the knee and that is why she wore a brace and that she had an upcoming surgery where part of the bone in the left knee would be removed to alleviate the instability.

As noted in the introduction, the Veteran was assigned temporary total ratings based on left knee surgery requiring convalescence effective May 29, 2007 to August 1, 2007, and November 22, 2011 to February 1, 2012. The issue of an increased rating during these time frames is moot, as the Veteran is already receiving the highest possible rating for the left knee disability.

The Veteran's left knee disability is rated under 38 C.F.R. § 4.71a, Diagnostic Code (DC) 5260 for limitation of flexion due to arthritis. Degenerative or traumatic arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joints or joint involved. 38 C.F.R. § 4.71a, DC 5003 and 5010. When there is arthritis and at least some limitation of motion, but the limitation of motion would be rated noncompensable under a limitation of motion code, a 10 percent rating may be assigned for each affected major joint or group of minor joints. Id. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. Id. 

Where the veteran has limited motion, 38 C.F.R. § 4.71a DC 5260 and 5261 provide ratings for limitation of flexion and extension of the knee, respectively. Under DC 5260, a noncompensable rating is assigned when flexion is limited to 60 degrees, a 10 percent rating is assigned when flexion is limited to 45 degrees, and a 20 percent rating is assigned when flexion is limited to 30 degrees. Under DC 5261, a noncompensable rating is assigned when extension is limited to 5 degrees, a 10 percent rating is assigned when extension is limited to 10 degrees, and a 20 percent rating is assigned when extension is limited to 15 degrees. 

Where functional loss is alleged due to pain upon motion, the provisions of 38 C.F.R. §§ 4.40 and 4.45 must be considered. DeLuca v. Brown, 8 Vet. App. 202, 207-08 (1995). Within this context, a finding of functional loss due to pain must be supported by adequate pathology, and evidenced by the visible behavior of the veteran. Johnston v. Brown, 10 Vet. App. 80, 85 (1997). However, when the maximum rating for limitation of motion of a joint has already been assigned, a finding of pain on motion cannot result in a higher rating. Id. 

The medical evidence shows that taking pain on motion into consideration, as required by DeLuca, at most, the Veteran has motion of his knees from -5 degrees of extension to 90 degrees of flexion in active range of motion (passive range of motion was from 0 to 120 degrees), as noted in an August 2013 VA treatment record. The examiner did not comment on whether there was any additional loss of motion after repetitive use testing. However, other treatment records do not indicate any further increase in loss of motion higher than 90 degrees. In a September 2008 VA examination report the Veteran's left knee range of motion was from 0 to 110 degrees with no additional loss of motion after repetitive use testing. The rest of the treatment records during the pertinent time frame show mostly full range of motion of the left knee. Most recently on examination in December 2013 the Veteran's left knee had flexion to 140 degrees, with painful motion starting at 120 degrees of flexion, full extension, and no additional motion loss after repetition.

These range of motion findings do not approach even the criteria for a compensable rating under DC 5260 or DC 5261, as flexion must be to at least 45 degrees (or extension to 10 degrees) to warrant a 10 percent rating. Nonetheless, a 10 percent rating can be assigned for limitation of motion based on arthritis even when the range of motion does not reach a compensable level. The 10 percent rating under DC 5260 appears to be based upon painful motion and functional loss. See 38 C.F.R. §§ 4.40, 4.45, 4.59; DeLuca v. Brown, 8 Vet. App. 202, 207-08 (1995). Therefore, a rating higher than 10 percent for the Veteran's left knee limitation of motion is not appropriate. To assign two, separate compensable ratings based on painful motion under two separate diagnostic codes (i.e., under Diagnostic Codes 5260 and 5261) would be in violation of the rule of pyramiding. See 38 C.F.R. § 4.14; VAOPGCPREC 9-04. 

In addition to the ratings based on limitation of motion, a separate rating may be assigned for instability of the knee. See VAOPGCPREC 23-97. Under Diagnostic Code 5257, a 10 percent rating is assigned slight recurrent subluxation or lateral instability; a 20 percent rating is assigned for moderate recurrent subluxation or lateral instability; and a 30 percent rating is assigned for severe recurrent subluxation or lateral instability. The schedule of ratings, does not define the terms "slight," "moderate," and "severe;" rather than applying a mechanical formula to make a determination, the Board evaluates all of the evidence such that decisions are "equitable and just." 38 C.F.R. § 4.6. 

Resolving all doubt in the Veteran's favor, the record shows that the Veteran has instability of the left knee throughout the appeals period. Prior to the left knee surgery on May 29, 2007, a May 2007 VA examination report shows that there were subjective complaints of instability in the left knee, with no objective findings of instability on examination. A previous April 2007 magnetic resonance imaging (MRI) report also shows complaints of instability and locking in the left knee. The Veteran's supervisor submitted a statement in July 2007 that she had observed the Veteran's knee giving way on her job as a librarian. A September 2008 VA examination report also shows the Veteran had instability in the left knee and wore a brace. As noted above, the Veteran further testified at the November 2011 Board hearing that she had instability in the left knee and wore a brace for this. On examination in December 2013 joint stability tests of the left knee were normal, but it was noted that the Veteran occasionally used a brace and a cane. 

Based on these findings a separate rating for instability of the left knee is warranted. With respect to the severity, there is no more than slight instability in the left knee. Overall the Veteran's complaints of instability are mostly subjective; however, the Veteran was issued a brace and underwent two surgeries during the course of the appeal indicating a somewhat significant problem in the left knee. Other records do not actually note instability, however, and most recently in December 2013 joint stability tests in the left knee were normal, though the Veteran still occasionally used a cane and brace. Therefore a separate rating of 10 percent, but not higher, for slight instability of the left knee is warranted for the entire appeals period.

With respect to the left knee, the medical evidence also shows that the Veteran had symptomatic removal of semilunar cartilage, which would warrant a 10 percent rating under DC 5259, as the Veteran had a meniscectomy in 2002. However, the functional impairment includes painful motion and instability, which is already compensated under DCs 5010-5260 and 5257. To assign a separate 10 percent rating for this functional impairment under DC 5259 would constitute pyramiding, which is not allowed under the regulations. See 38 C.F.R. § 4.14. DC 5258 allows for a 20 percent rating for dislocated semilunar cartilage with frequent episodes of locking, pain, and effusion into the joint. The record shows that the Veteran has complaints of locking, pain, and effusion into the joint. However, the Veteran does not have a history of dislocated meniscus (semilunar) but rather a tear. Therefore, a rating under DC 5258 does not apply.

With respect to the left knee, the medical evidence also shows that after the left knee surgery in November 2011 in which part of her bone was removed, she had shortening of one of the extremities (though it was noted on an August 2013 VA treatment record that it was actually the right lower extremity that was one inch shorter than the left lower extremity). Under 38 C.F.R. § 4.71a, DC 5275 a compensable rating is not warranted unless there is at least 1 1/4 inch discrepancy in the bones of the lower extremities. Moreover, it is not clear if the discrepancy in leg length is due to the left knee surgery, as it is the right leg that is actually shorter. 

Finally, the medical evidence does not show any ankyloses of the left knee; thus a higher rating is not warranted under 38 C.F.R. § 4.71a, DC 5256. 

The Veteran is competent to report symptoms associated with her knee disability, and there is no reason shown to doubt her credibility in this regard. Layno v. Brown, 6 Vet. App. 465 (1994); Barr v. Nicholson, 21 Vet. App. 303, 308 (2007). Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), as to the specific issue in this case, the severity of the clinical manifestations of her left knee disability, falls outside the realm of common knowledge of a lay person. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007) (lay persons not competent to diagnose cancer). And, even if her opinion were entitled to be accorded greater probative value, it is far outweighed by the medical evidence of record demonstrating clinical analysis of the knee. Id; see also Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006).

For all the foregoing reasons, the Board finds that there are no objective medical findings that would support the assignment of a rating in excess of 10 percent for limitation of motion in the left knee; but that a separate rating of 10 percent, but not higher, for instability of the left knees is warranted. Therefore, entitlement to an increased rating for the left knee disability is granted, in part. The Board has considered staged ratings under Hart v. Mansfield, 21 Vet. App. 505 (2007), but concludes that they are not warranted. 

B) Cervical Spine and Right C5-6 Radiculopathy

The RO granted service connection for the Veteran's cervical spine disability in a November 2002 rating decision assigning a 10 percent rating. The Veteran submitted an increased rating claim in November 2008 indicating the condition of her cervical spine had worsened.

The RO granted an increased rating of 20 percent for the Veteran's cervical spine disability in a January 2009 rating decision, effective November 25, 2008, the date of the Veteran's increased rating claim. The Veteran appealed this rating decision to the Board indicating that her cervical spine disability should be rated higher. 

The Veteran's cervical spine disorder is currently rated under 38 C.F.R. § 4.71a, DC 5242, for degenerative arthritis. DCs 5235 to 5243 are evaluated under the General Rating Formula for Diseases and Injuries of the Spine (unless DC 5243 is rated under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes).

Under the General Rating Formula for Diseases and Injuries of the Spine, with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease, forward flexion of the cervical spine greater than 15 degrees but not greater than 30 degree; or, the combined range of motion of the cervical spine not greater than 170 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis warrants a 20 percent disability rating. 

Forward flexion of the cervical spine of 15 degrees or less; or, favorable ankylosis of the entire cervical spine warrants a 30 percent disability rating. 

Unfavorable ankylosis of the entire spine warrants a 100 percent disability rating. 68 Fed. Reg. 51,456 (2003) (now codified at 38 C.F.R. § 4.71a, DC 5242 (2013)).

Note (1): Evaluate any associated objective neurologic abnormalities, including, but not limited to, bowel or bladder impairment, separately, under an appropriate diagnostic code.

Note (2): (See also Plate V.) For VA compensation purposes, normal forward flexion of the cervical spine is 0 to 45 degrees, extension is 0 to 45 degrees, left and right lateral flexion are 0 to 45 degrees, and left and right lateral rotation are 0 to 80 degrees. The combined range of motion refers to the sum of the range of forward flexion, extension, left and right lateral flexion, and left and right rotation. The normal combined range of motion of the cervical spine is 340 degrees. The normal ranges of motion for each component of spinal motion provided in this note are the maximum that can be used for calculation of the combined range of motion.

Note (5): For VA compensation purposes, unfavorable ankylosis is a condition in which the entire cervical spine is fixed in flexion or extension, and the ankylosis results in one or more of the following: difficulty walking because of a limited line of vision; restricted opening of the mouth and chewing; breathing limited to diaphragmatic respiration; gastrointestinal symptoms due to pressure of the costal margin on the abdomen; dyspnea or dysphagia; atlantoaxial or cervical subluxation or dislocation; or neurologic symptoms due to nerve root stretching. Fixation of a spinal segment in neutral position (0 degrees) always represents favorable ankylosis.

The Veteran's cervical spine range of motion was most severely limited to 20 degrees of forward flexion on VA examination in January 2009. The Veteran also complained that she had pain throughout the range of motion. However, there was no additional loss of motion after repetition. Extension was to 30 degrees. In March 2010, the Veteran had 45 degrees of flexion and 40 degrees of extension with no additional loss of motion after repetition or objective findings of pain. The Veteran complained of pain in all movements, but the examiner commented that the Veteran's subjective complaints seemed to be out of proportion to the examination findings. The Veteran later testified at the November 2011 Board hearing that the examiner forced her neck to move farther than she could comfortably move and that she experienced neck pain for a while after the examination. See Board hearing transcript, pp. 3-4, 12-13. The most recent examination in December 2013 notes, however, that the Veteran had 45 degrees of flexion and extension with no objective evidence of pain motion and no additional loss of motion after repetitive movements. None of the medical findings of record indicate any ankylosis of the cervical spine. As the medical evidence does not indicate 15 degrees of forward flexion or ankylosis of the cervical spine, these findings do not warrant a rating higher than 20 percent under DC 5242.

Even though the Veteran complained of pain in all movements on examination in January 2009, pain by itself does not warrant a higher rating unless it results in functional impairment. Although pain may be a cause or manifestation of functional loss, limitation of motion due to pain is not necessarily rated at the same level as functional loss where motion is impeded. See Mitchell v. Shinseki, 25 Vet. App. 32, 38-43 (2011). Instead, the Mitchell Court explained that pursuant to 38 C.F.R. §§ 4.40 and 4.45, the possible manifestations of functional loss include decreased or abnormal excursion, strength, speed, coordination, or endurance (38 C.F.R. § 4.40), as well as less or more movement than is normal, weakened movement, excess fatigability, and pain on movement (as well as swelling, deformity, and atrophy) that affects stability, standing, and weight-bearing (38 C.F.R. § 4.45). Thus, functional loss caused by pain must be rated at the same level as if the functional loss were caused by any of the other factors cited above. Therefore, in evaluating the severity of a joint disability, VA must determine the overall functional impairment due to these factors. 

The Veteran was still able to move her cervical spine to 20 degrees of forward flexion in January 2009 in spite of the pain. Also, later examination showed even greater range of motion, with the most recent examination in December 2013 showing full range of motion in flexion and extension with no pain on movement during these motions (although there was painful and limited motion on lateral rotation). See 38 C.F.R. § 4.71a, Plate V, full range of motion of the cervical spine includes 0 to 45 degrees of flexion and extension. It is also significant that the examiner commented in August 2010 that the Veteran's complaints seemed to be out of proportion to the objective findings on examination, although the Board does note that the Veteran testified that this examiner unfairly pushed her neck too far. 

As a whole, even with taking the Veteran's complaints of pain into account, the medical evidence more closely approximates the criteria for a 20 percent rating under DC 5242. The Veteran's complaints of pain in all ranges of motion in January 2009 are not consistent with ankylosis, given that she was still able to move her cervical spine past 0 degrees, and she was later shown to have even greater range of motion in the cervical spine on examinations in August 2010 and December 2013. Ankylosis is defined as "immobility and consolidation of a joint due to disease, injury, or surgical procedure." Dorland's Illustrated Medical Dictionary, 28th edition, p. 86. The Veteran's cervical spine is not immobile or consolidated. Also, as she could move her neck past 15 degrees of forward flexion, she did not meet the criteria for the next higher rating under DC 5242. Therefore, a higher rating based on limitation of motion is not warranted.

In addition, a rating higher than 20 percent is not warranted under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes, as the medical evidence demonstrates that the Veteran has never had any physician-prescribed bed rest, nor has she been diagnosed with intervertebral disc syndrome of the cervical spine.

In addition to considering the orthopedic manifestations of the Veteran's cervical spine disability, VA regulations also require that consideration be given to any objective neurologic abnormalities associated with this disability, which are to be evaluated separately under an appropriate diagnostic code. 

As noted in the introduction, in the January 2009 rating decision, the RO granted service connection for right C5-6 radiculopathy assigning a 10 percent rating, effective November 25, 2008 under 38 C.F.R. § 4.124a , DC 8515 for paralysis of the median nerve.

Under DC 8515, a 10 percent rating is assigned for mild incomplete paralysis of the median nerve of the major hand; a 30 percent rating is assigned for moderate incomplete paralysis of the median nerve of the major hand; a 50 percent rating is assigned for severe incomplete paralysis of the median nerve of the major hand; and a 70 percent rating is assigned for complete paralysis of the median nerve of the major hand, which contemplates the hand inclined to the ulnar side, the index and middle fingers more extended than normally, considerable atrophy of the muscles of the thenar eminence, the thumb in the plane of the hand (ape hand); pronation incomplete and defective, absence of flexion of index finger and feeble flexion of middle finger, cannot make a fist, index and middle fingers remain extended; cannot flex distal phalanx of thumb, defective opposition and abduction of the thumb, at right angles to palm; flexion of wrist weakened; pain with trophic disturbances. 38 C.F.R. § 4.124a, DC 8515. 

The Board notes that, in rating peripheral nerve injuries and their residuals, attention should be given to the site and character of the injury, the relative impairment and motor function, trophic changes, or sensory disturbances. 38 C.F.R. § 4.120. Additionally, the Board notes that, under 38 C.F.R. § 4.124a, disability from neurological disorders is rated from 10 to 100 percent in proportion to the impairment of motor, sensory, or mental function. With partial loss of use of one or more extremities from neurological lesions, rating is to be by comparison with mild, moderate, severe, or complete paralysis of the peripheral nerves. The schedule of ratings does not define the terms "moderate" and "severe;" rather than applying a mechanical formula to make a determination, the Board evaluates all of the evidence such that decisions are "equitable and just." 38 C.F.R. § 4.6. 

The term "incomplete paralysis," with respect to nerve injuries, indicates a degree of loss or impaired function substantially less than the type pictured for "complete paralysis" given with each nerve, whether due to the varied level of the nerve lesion or to partial regeneration. 38 C.F.R. § 4.124a, Note. When the involvement is wholly sensory, the rating should be for the mild, or at most, the moderate degree. See id. The maximum rating to be assigned for neuritis not characterized by organic changes referred to in this section will be that for moderate incomplete paralysis. 38 C.F.R. § 4.123. The maximum rating to be assigned for neuralgia, usually characterized by a dull and intermittent pain of typical distribution so as to identify the nerve, will be that equal to moderate incomplete paralysis. 38 C.F.R. § 4.124. 

The medical evidence shows that the Veteran, at most, has mild incomplete paralysis of the right upper extremity. A January 2009 VA examination showed that there was clinical evidence of right C5-6 radiculopathy and that sensory examination was impaired on the right side. A January 2009 addendum to this examination also noted weakened grip strength on the right side and decreased range of motion in the right upper extremity secondary to pain. The medical evidence does not show that there is moderate incomplete paralysis of the right side, as noted on later VA examinations in August 2010 and December 2013 showing normal sensory examination, reflexes and strength examinations in both upper extremities. The December 2013 VA examination report further noted that there were no signs or symptoms of radiculopathy. 

The Veteran has submitted statements and testimony that she has experienced pain and numbness in both upper extremities and has weakened grip strength. However, the clinical evidence of record does not show any impairment in the left upper extremity. The January 2009 VA examination report notes that electrodiagnostic studies in September 2008 showed a normal study on the left. Also later examinations in August 2010 and December 2013 show no signs or symptoms of radiculopathy in either extremity on objective evaluation.

The Board finds that, based on the evidence of record, the Veteran's right C5-6 radiculopathy does not warrant a rating higher than 10 percent under 38 C.F.R. § 4.124a , DC 8515. There is no medical evidence that the 10 percent rating assigned does not adequately compensate the Veteran for her functional limitations. 

The Veteran has submitted statements that she also has bowel problems associated with her cervical spine disability, but she has been inconsistent in this regard. For instance, on the January 2009 VA examination report the Veteran denied any urinary or bowel incontinence. She also denied bowel or bowel problems in a March 2010 statement. However, in an April 2010 statement, she indicated that she experienced frequent and uncontrolled bowel movements. Later on examination in August 2010 she indicated that she had no bowel or bladder problems; and examination in December 2013 also noted no history of bowel or bladder incontinence. However, the Veteran submitted a statement a few days after the December 2013 VA examination report that her cervical spine was causing bladder leakage and incontinence requiring the use of an adult diaper. The probative value of the Veteran's statements regarding whether she has bowel or bladder incontinence is undermined by the inconsistency in her reporting. Moreover, she is not competent to relate any bowel or bladder incontinence to her cervical spine disability. Therefore, the Board cannot rely on the Veteran's statements concerning any bowel or bladder problems as being credible. Thus, the Board infers based on her inconsistent statements and the normal neurological findings of record (other than mild incomplete paralysis of the right upper extremity) that the Veteran does not have any bowel or bladder complaints due to her cervical spine disability.

The Veteran is competent to report symptoms associated with her cervical spine disability. Other than her inconsistent statements concerning whether she has bowel or bladder incontinence, there is no reason shown to doubt her credibility with respect to her complaints regarding her cervical spine, notwithstanding the August 2010 VA examiner's assessment that the Veteran seemed to be exaggerating her symptoms. Layno v. Brown, 6 Vet. App. 465 (1994); Barr v. Nicholson, 21 Vet. App. 303, 308 (2007). Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), as to the specific issue in this case, the severity of the clinical manifestations of her cervical spine disability and neurological impairment, falls outside the realm of common knowledge of a lay person. See Jandreau v. Nicholson, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007) (lay persons not competent to diagnose cancer). And, even if her opinion were entitled to be accorded greater probative value, it is far outweighed by the medical evidence of record demonstrating clinical analysis of the cervical spine. Id; see also Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006).

For all the foregoing reasons, the Board finds that there are no objective medical findings that would support the assignment of a rating in excess of 20 percent for the cervical spine, or in excess of 10 percent for right C5-6 radiculopathy. Therefore, entitlement to an increased rating for the cervical spine disability is denied. The Board has considered staged ratings under Hart v. Mansfield, 21 Vet. App. 505 (2007), but concludes that they are not warranted. 

D) TDIU

An inferred claim for a total disability rating based on individual unemployability (TDIU) under Rice v. Shinseki, 22 Vet. App. 447 (2009) also has been considered. However the issue of unemployability has not been raised by the record, as there is no evidence of, nor contention from the Veteran that he has been rendered unable to work as a result of her knee or cervical spine disabilities, including radiculopathy due to the cervical spine. The record shows that she was working as a librarian; the Veteran confirmed that she continued to be employed as such at the November 2011 Board hearing. Therefore, any inferred TDIU claim is inapplicable in this case.

III. Extraschedular Rating

The rating schedule represents as far as is practicable, the average impairment of earning capacity. Ratings will generally be based on average impairment. See 38 C.F.R. § 3.321(a), (b) (2013). To afford justice in exceptional situations, an extraschedular rating can be provided. See 38 C.F.R. § 3.321(b). 

The Court clarified the analytical steps necessary to determine whether referral for extraschedular consideration is warranted in Thun v. Peake, 22 Vet. App. 111 (2008). First, the RO or the Board must determine whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. Second, if the schedular evaluation does not contemplate the veteran's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the C&P Service to determine whether, to accord justice, the veteran's disability picture requires the assignment of an extraschedular rating. 

The symptoms associated with the Veteran's left knee and cervical spine disabilities (i.e., pain on use, limitation in motion, weakness, and instability) are not shown to cause any impairment that is not already contemplated by the rating criteria. DC 5260 contemplates limitation of motion in the knees; and DC 5257 contemplates instability of the knees. DC 5242 also contemplates limitation of motion of the cervical spine; and DC 8515 contemplates mild weakness in the right upper extremity due to neurological impairment.

The record shows that the Veteran's disabilities affect her employment as a librarian in that she has trouble lifting books over her head and in any significant prolonged standing. She also testified as the November 2011 Board hearing that she lost about one day a week from work due to her service-connected disabilities. See Board hearing transcript, p. 20. However, the rating schedule contemplates time lost from work. The Veteran's disabilities also are not shown to result in frequent periods of hospitalization. The evidence does not show that the Veteran's disabilities are unusual.

Thus, the Board finds that these rating criteria reasonably describe the Veteran's disabilities. For these reasons, referral for consideration of an extraschedular rating is not warranted for this claim.





ORDER

Entitlement to an evaluation higher than 10 percent for chondromalacia and degenerative joint disease of the left knee is denied.

Entitlement to a separate evaluation of 10 percent, but no higher, for instability of the left knee is granted, subject to the rules governing the payment of monetary benefits. 

Entitlement to an evaluation in excess of 20 percent for traumatic arthritis of the cervical spine is denied.

Entitlement to an initial evaluation higher than 10 percent for right C5-6 radiculopathy (major) (also claimed as arm/hand weakness, right side pain, and shoulder blade pain) is denied.

Entitlement to service connection for a psychiatric disorder to include major depression and posttraumatic stress disorder secondary to personal trauma, manifested by anxiety and depression with emotional stress and sleep disorder, is granted.

Entitlement to service connection for trouble swallowing is denied.

Entitlement to service connection for fever and night sweats is denied.

Entitlement to service connection for right leg muscle spasms with radiating pain and loss of feeling, right foot is denied.


REMAND

Given the grant of service connection for a psychiatric disability during the present Board decision, the issue of entitlement to service connection for hypertension and headaches with dizziness, secondary to the service-connected psychiatric disability has been raised by the record. Therefore, a medical opinion is warranted to address whether it is at least as likely as not that the Veteran's hypertension and/or headaches were aggravated by the (now) service-connected psychiatric disability.

Regarding the increased rating claim for the eye disabilities, the Veteran submitted a notice of disagreement in August 2011 with the rating assigned for these disabilities in a September 2010 rating decision. Thus, a statement of the case addressing this issue must be provided. 38 U.S.C.A. § 7105; 38 C.F.R. §§ 19.26, 19.29, 19.30; Manlincon v. West, 12 Vet. App. 238 (1999).

Accordingly, the case is REMANDED for the following action:

1. Make arrangements to obtain any additional treatment records pertaining to the headaches and/or hypertension from the relevant VAMC and or private treatment provider, if identified by the Veteran.

2. Make arrangements to obtain medical opinions to address whether it is at least as likely as not (50 percent or greater probability) that the current diagnoses of hypertension and/ or headaches were caused, or aggravated (permanently worsened) beyond the natural progress of the disorder by the Veteran's service-connected psychiatric disorder. If warranted, the examiner(s) should examine the Veteran prior to making these assessments.

The claims file must be made available to, and reviewed by, the examiner. Any appropriate testing should be conducted.

Please provide a complete rationale for your opinion(s). If you cannot answer the above questions without resorting to speculation or remote possibility, please indicate why that is so.

3. After the requested opinions and any necessary examinations have been completed, the reports should be reviewed to ensure that they are in complete compliance with the directives of this remand. If any report is deficient in any manner, it should be returned to the examiner for corrective action.

4. The RO should issue a statement of the case to the Veteran and her representative addressing her disagreement with the rating assigned for her bilateral eye disabilities. The statement of the case should include all relevant law and regulations pertaining to the claim. The Veteran must be advised of the time limit in which she may file a substantive appeal. See 38 C.F.R. § 20.302(b). Thereafter, if an appeal has been perfected, this issue should be returned to the Board.

5. Finally, readjudicate the claim on appeal. If the benefit remains denied, issue the Veteran and her representative a Supplemental Statement of the Case and allow for a reasonable period to respond. 

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court 

of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2013).




______________________________________________
K. PARAKKAL
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs